**ORAL ARGUMENT SCHEDULED FOR JUNE 4, 2014**
No. 14-1284

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**
_____

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellant,*

**v.**

**ADEL DAOUD,**
*Defendant-Appellee.*
_____

On Appeal From the United States District Court
For the Northern District of Illinois, Case No. 1:12-cr-00723
Honorable Sharon Johnson Coleman
_____

**BRIEF FOR APPELLEE**

_____

John D. Cline                         Thomas Anthony Durkin
LAW OFFICE OF JOHN D. CLINE          Janis D. Roberts
235 Montgomery St., Suite 1070       Joshua G. Herman
San Francisco, CA 94104              DURKIN & ROBERTS
Telephone:  (415) 322-8319           2446 North Clark
                                     Chicago, IL 60614
                                     Telephone: (312) 913-9300

Attorneys for Defendant-Appellee
ADEL DAOUD

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Court of Appeals No.:     14-1284

Short caption:               United States v. Adel Daoud

Full name of every party represented:  Adel Daoud

Names of law firms and lawyers that appeared for the party:

      DURKIN & ROBERTS
      Thomas Anthony Durkin
      Janis D. Roberts
      Joshua G. Herman

      LAW OFFICE OF JOHN D. CLINE
      John D. Cline

Attorney's printed name and address:

      LAW OFFICE OF JOHN D. CLINE
      John D. Cline
      235 Montgomery St., Suite 1070
      San Francisco, CA  94104
      Telephone:  (415) 322-8319
      Facsimile:   (415) 524-8265
      Email:        cline@johndclinelaw.com

      DURKIN & ROBERTS
      Thomas Anthony Durkin
      2446 North Clark
      Chicago, IL  60614
      Telephone:  (312) 913-9300
      Facsimile:   (312) 913-9235
      Email:        tdurkin@durkinroberts.com

                        **John D. Cline**, one of the attorneys
                        for Defendant-Appellee Adel Daoud

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUE PRESENTED ........................................................................... 2

STATEMENT OF THE CASE ............................................................... 3

    I.      PROCEEDINGS BELOW ...................................................... 3

          A. FISA Notice .............................................................. 3

          B. FAA Issues ............................................................... 4

          C. FISA Motion to Suppress and for Disclosure ............... 5

          D. District Court's Order ................................................ 7

    II.     FACTUAL SUMMARY ........................................................ 8

SUMMARY OF ARGUMENT ............................................................ 10

ARGUMENT .................................................................................. 11

    I.      THE STANDARD OF REVIEW .......................................... 12

    II.     THE PURPOSE AND STRUCTURE OF FISA ...................... 13

    III.    THE WORD "NECESSARY" IN 50 U.S.C. § 1806(f) MEANS THAT DISCLOSURE WOULD SUBSTANTIALLY PROMOTE AN ACCURATE DETERMINATION OF LEGALITY ..................................................................... 20

          A. Courts Routinely Interpret "Necessary" To Mean Something Less Than Essential .................................. 20

          B. The Legislative History of FISA ................................ 23

          C. The Legislative Purpose ............................................ 29

               1. Protecting Civil Liberties .................................... 30

               2. Protecting National Security ................................ 35

          D. Summary ................................................................. 41

    IV.    THE GOVERNMENT'S REMAINING COMPLAINTS ABOUT THE DISTRICT COURT'S ORDER ARE BASELESS ................................................................... 42

          A. The District Court Recited the Correct Legal Standard ............... 42

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

B. The District Court Had No Obligation to Detail Its Analysis in Its Order........................................................................43

CONCLUSION ...............................................................................44

STATEMENT CONCERNING ORAL ARGUMENT .........................................44

# TABLE OF AUTHORITIES

Page

### CASES

*Abelesz v. OTP Bank,*
   692 F.3d 638 (7th Cir. 2012) ..................................................................2

*Alderman v. United States,*
   165 U.S. 165 (1969)................................................................................6

*Armour & Co. v. Wantock,*
   323 U.S. 126 (1944)..............................................................................21

*Cellco Partnership v. FCC,*
   357 F.3d 88 (D.C. Cir. 2004)..........................................................10, 20

*Circuit City Stores, Inc. v. Adams,*
   532 U.S. 105 (2001)..............................................................................29

*Commissioner v. Tellier,*
   383 U.S. 687 (1966)..............................................................................21

*CT&IA v. FCC,*
   330 F.3d 502 (D.C. Cir. 2003)..............................................................20

*Franks v. Delaware,*
   438 U.S. 154 (1978)..................................................................6, 30, 31

*FTC v. Rockefeller,*
   591 F.2d 182 (2d Cir. 1979) .................................................................22

*Hall v. United States,*
   132 S.Ct. 1882 (2012)...........................................................................28

*In re All Matters,*
   218 F. Supp. 2d 611(Foreign Int. Surv. Ct. 2002)..............................31

*In re Kevork,*
   788 F.2d 566 (9th Cir. 1986) ................................................15, 17, 29

*In re Sealed Case,*
   310 F.3d 717 (Foreign Int. Surv. Ct. Rev. 2002)...................16, 17, 31

*In re Tangible Things From [REDACTED]*,
  Dkt. BR 08-13 (Foreign Int. Surv. Ct. March 2, 2009) ......................................32

*In re Washington Post Co.*,
  807 F.2d 383 (4th Cir. 1986) ..............................................................................40

*Jinks v. Richland County*,
  538 U.S. 456 (2003).............................................................................................21

*Joint Anti-Fascist Refugee Committee v. McGrath*,
  341 U.S. 123 (1951).............................................................................................30

*McCulloch v. Maryland*,
  17 U.S (4 Wheat) 316 (1819)...............................................................................21

*New York Times Co. v. United States*,
  403 U.S. 713 (1971).............................................................................................38

*Prometheus Radio Project v. FCC*,
  373 F.3d 372 (3d Cir. 2004) ................................................................................22

*Ryan v. United States*,
  725 F.3d 623 (7th Cir. 2013) ...............................................................................29

*Snider v. United States*,
  468 F.3d 500 (8th Cir. 2006) ...............................................................................21

*Tradesman Int'l, Inc. v. Black*,
  724 F.3d 1004 (7th Cir. 2013) .............................................................................12

*United States v. Abu-Jihaad*,
  630 F.3d 102 (2d Cir. 2010) ................................................................................43

*United States v. Butenko*,
  494 F.2d 593 (3d Cir. 1974) (en banc) ...............................................24, 25, 26, 41

*United States v. Cavanagh*,
  807 F.2d 787 (9th Cir. 1987) .........................................................................15, 19

*United States v. Damrah*,
  412 F.3d 618 (6th Cir. 2005) ...............................................................................12

*United States v. Dumeisi*,
   424 F.3d 566 (7th Cir. 2005) ...........................................................12, 13, 18, 43

*United States v. El-Mezain*,
   664 F.3d 467 (5th Cir. 2011) ..............................................................................12

*United States v. Gowadia*,
   210 U.S. Dist. LEXIS 80572 (D. Haw. May 8, 2010)........................................36

*United States v. Hammoud*,
   381 F.3d 316 (4th Cir. 2004) (en banc), *vacated*, 543 U.S. 1097 (2005),
   *reinstated*, 405 F3d 1034 (4th Cir. 2005) (en banc) ............ 14, 15, 16, 17, 18, 29

*United States v. Harris*,
   531 F.3d 507 (7th Cir. 2008) ..............................................................................12

*United States v. Isa*,
   923 F.2d 1300 (8th Cir. 1991) ............................................................................44

*United States v. James Daniel Good Real Property*,
   510 U.S. 43 (1993)........................................................................................30, 31

*United States v. Lee*,
   2000 U.S. App. LEXIS 3082 (10th Cir. Feb. 29, 2000)................................37, 39

*United States v. O'Hara*,
   301 F.3d 563 (7th Cir. 2002) ..............................................................................12

*United States v. Plescia*,
   48 F.3d 1452 (7th Cir. 1995) ..............................................................................13

*United States v. Posey*,
   864 F.2d 1487 (9th Cir. 1989) ............................................................................15

*United States v. Progressive Inc.*,
   486 F. Supp. 5 (D.Wis.), *dismissed as moot*, 610 F.2d 819 (7th Cir.1979) .......39

*United States v. Robers*,
   698 F.3d 937 (7th Cir. 2012) ..............................................................................28

*United States v. Sarkissian*,
   841 F.2d 959 (9th Cir. 1988) ..............................................................................15

v

*United States v. Squillacote*,
   221 F.3d 542 (4th Cir. 2000) ...............................................................43

*United States v. Tyra*,
   454 F.3d 686 (7th Cir. 2006) ...............................................................42

*United States v. United States District Court for the Eastern District of Michigan (Keith)*,
   407 U.S. 297 (1972)..............................................................................13

*United States v. Woods*,
   556 F.3d 616 (7th Cir. 2009) ...............................................................42

*United States v. Young*,
   41 F.3d 1184 (7th Cir. 1994) ...............................................................12

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. art. I § 8.............................................................................21

15 U.S.C. § 46......................................................................................22

18 U.S.C. § 844.................................................................................1, 3

18 U.S.C. § 2332...............................................................................1, 3

18 U.S.C. § 3231....................................................................................1

26 U.S.C. § 6103....................................................................................1

28 U.S.C. § 1291....................................................................................1

50 U.S.C. § 1801............................................................................*passim*

50 U.S.C. § 1803..................................................................................15

50 U.S.C. § 1804.......................................................................15, 16, 18

50 U.S.C. § 1805..................................................................................18

50 U.S.C. § 1806............................................................................*passim*

50 U.S.C. § 1823..................................................................................15

50 U.S.C. § 1825....................................................................................3

50 U.S.C. § 1881 ........................................................................................4

**OTHER**

Classified Information Procedures Act,
    18 U.S.C. App. 3 ........................................................*passim*

S. Rep. 755, 94th Cong. 2d Sess. (1976) .............................................14

S. Rep. 604(I), 95th Cong., 1st Sess.,
    *reprinted in* 1978 U.S.C.C.A.N. 3904 ........................................*passim*

S. Rep. 701, 95th Cong., 1st Sess.,
    *reprinted in* 1978 U.S.C.C.A.N. 3973 ........................................*passim*

H. Conf. Rep. 1720, 95th Cong.,
    2d Sess. 23 (Oct. 5, 1978)......................................................28

David S. Kris & J. Douglas Wilson,
    *National Security Investigations & Prosecutions*,
    (2d ed. 2012)...............................................................22, 27

Michael Glennon,
    *National Security and Double Government*,
    5 Harv. National Security J. 1 (2014)................................................34

9 United States Attorney's Manual, Criminal Resource Manual § 2054(I)(C) .......36

John Rizzo,
    *Company Man: Thirty Years of Controversy and Crisis in The CIA*,
    (Scribner 2014).............................................................40

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement is not complete and correct in all respects.

Defendant-appellee Adel Daoud was charged with violations of 18 U.S.C. § 2332a(a)(2)((D) and 18 U.S.C. § 844(i).   R.16; A4-5.[1]   The district court had jurisdiction under 18 U.S.C. § 3231.

On January 29, 2014 the district court entered an order requiring the government to disclose to defense counsel classified applications and related materials filed with the Foreign Intelligence Surveillance Court under the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et. seq*.   R.92; SA1-5.   On February 10, 2014, the government timely filed a notice of appeal from that order. R.97.

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.   Section 1291 gives this Court "jurisdiction of appeals from all final decisions of the district courts."   Under 50 U.S.C. § 1806(h), the district court's January 29 disclosure order constitutes a "final order."   It thus may be appealed under § 1291.

---

[1] The record on appeal is cited as "R" followed by the district court docket number. Appellant's Short Appendix is cited as "SA," followed by the page number from the lower right-hand corner of the page.   Appellant's Appendix is cited as "A."   Appellant's redacted, unclassified opening brief is cited as "G.Br."   The defense does not have access to the government's classified brief and thus cannot respond to the arguments it makes in classified form.

The district court's order is also appealable under 18 U.S.C. App. 3 § 7(a), which permits the government to take an interlocutory appeal "from a decision or order of a district court in a criminal case authorizing the disclosure of classified information."  The government's appeal was timely under *id*. § 7(b), because the government filed its notice of appeal on February 10, 2014, twelve days after the district court's ruling.  R.92, 97.

Contrary to appellant's position, mandamus is not appropriate because—for the reasons discussed in the "Argument" section below—the government has not shown either that it will suffer "irreparable harm" absent the writ or that it has a "clear right to the writ."  *Abelesz v. OTP Bank*, 692 F.3d 638, 652 (7th Cir. 2012).

## ISSUE PRESENTED

Did the district court abuse its discretion in ordering disclosure of FISA applications and orders to cleared defense counsel under the protections of CIPA?

This issue has two sub-issues:

1.    Did the district court correctly interpret the phrase "necessary to make an accurate determination of the legality of the surveillance" in 50 U.S.C. § 1806(f)?

2.    Did the district court abuse its discretion in finding disclosure warranted in this case under § 1806(f)?

# STATEMENT OF THE CASE

## I.    **PROCEEDINGS BELOW.**

On September 15, 2012, the government filed a criminal complaint charging defendant-appellee Adel Daoud with attempting to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2)(D) (Count One) and attempting to destroy a building by means of an explosive in violation of 18 U.S.C. § 844i (Count Two). A6.   An indictment charging the same offenses was returned on September 20, 2012.  A4.

### A.    **FISA Notice.**

On September 18, 2012, the government filed its "Notice of Intent to Use Foreign Intelligence Surveillance Act Information."   R.9.   In that filing, the government declared that, under 50 U.S.C. §§ 1806(c) and 1825(d), it "intends to offer into evidence, or otherwise use or disclose in any proceedings in this matter, information obtained and derived from electronic surveillance conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829."  *Id.*

**B.      FAA Issues.**

Although the September 18, 2012 notice was limited to FISA, questions arose about the government's potential use of the FISA Amendments Act ("FAA"), which was signed into law on July 10, 2008 and is codified at 50 U.S.C. § 1881a. These questions were spurred by Senate floor comments made by Senator Diane Feinstein (Chairman of the U.S. Senate Select Committee on Intelligence) on December 27, 2012, in favor of the reauthorization of the FAA.   During her comments, Senator Feinstein suggested that the FAA was used in nine cases, including what she called a "plot to bomb a downtown Chicago bar"—which is a clear reference to defendant's case.   Based on Senator Feinstein's comments suggesting that the FAA was used in defendant's case, counsel filed a motion seeking notice of FAA evidence under 50 U.S.C. §§ 1881e(a) and 1806(c).   R.42. Through this motion, defendant requested that the government provide notice of: "(1) whether the electronic surveillance described in its FISA Notice was conducted pursuant to the pre-2008 provisions of [FISA] or, instead, the [FAA]; and, (2) whether the affidavit and other evidence offered in support of any FISA order relied on information obtained or derived from an FAA surveillance order." R.42 at 1.

On August 8, 2013, the government filed a "Sur-Reply" to defendant's motion.   It acknowledged that notice would be required if the government

"intended to use in this case any information obtained or derived from surveillance authorized under [the FAA] as to which the defendant is an aggrieved person." R.49 at 1-2. The government added that no notice was necessary in this case because it "does not intend to use any such evidence obtained or derived from FAA-authorized surveillance in the course of this prosecution." *Id*. at 2.

### C. FISA Motion to Suppress and for Disclosure.

On August 9, 2013, the defense filed its motion for disclosure of FISA material and to suppress the fruits of FISA and any other electronic surveillance. R.51 (motion), 52 (memorandum of law). As set forth in the motion, defendant sought to suppress "the fruits of any FISA surveillance and for disclosure of FISA-related materials that may be necessary to litigate motions for discovery and a suppression motion." R.51 at 2. Counsel acknowledged that, without an opportunity to review the FISA applications and any surveillance orders, it was impossible to allege precisely why the government's specific allegations were inadequate. *E.g.*, R.52 at 10, 12. Based on the information available to defendant, counsel did, however, identify eight potential grounds for suppression and disclosure, including the following:

- the FISA applications for electronic surveillance of defendant's e-mail accounts may fail to establish probable cause that defendant, a high school student from suburban Chicago and United States citizen, was "an agent of a foreign power";

- the FISA applications may contain intentional or reckless

material falsehoods or omissions, and therefore may violate the Fourth Amendment principles identified in *Franks v. Delaware*, 438 U.S. 154 (1978);

- the primary purpose of the electronic surveillance was to obtain evidence of domestic criminal activity and not foreign intelligence information—or, alternatively, capturing foreign intelligence information was not a "significant" purpose of the FISA surveillance;

- the FISA surveillance may have been based impermissibly on activity protected by the First Amendment;

R.51 at 3. The motion requested the following relief:

- review all applications for electronic surveillance of the defendant conducted pursuant to FISA;

- order disclosure of the applications for the FISA warrants to defendant's counsel pursuant to an appropriate protective order;

- conduct an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978); and,

- as a result, suppress all FISA intercepts and seizures, and fruits thereof, derived from illegally authorized or implemented FISA electronic surveillance.

R.51 at 4. Counsel sought disclosure of the FISA materials under the provisions of 50 U.S.C. § 1806(f) and under the due process provision set forth in 50 U.S.C. § 1806(g). R.52 at 24-25. Counsel noted that appropriate security procedures could be crafted to allay any concerns regarding the disclosure of classified material to cleared defense counsel. R.52 at 25. Counsel also argued that *ex parte* proceedings were antithetical to the adversary system of justice, citing *Alderman v. United States*, 394 U.S. 165 (1969). R.52 at 26-29.

On October 25, 2013, the government responded with a 61-page redacted, declassified pleading.  R.73.  The extensive redactions in the pleading included the majority of the government's substantive arguments and effectively prevented the defense from addressing the government's specific arguments.

In defendant's reply brief, filed on November 25, 2013, counsel cited a number of recently disclosed opinions from the Foreign Intelligence Surveillance Court ("FISC"), which were critical of misrepresentations made by the government in *ex parte* proceedings concerning electronic surveillance programs.  R.74.

### D.     District Court's Order.

As FISA contemplates, the district court, acting *ex parte* and *in camera*, conducted a "thorough and careful review of the FISA application and related materials."  SA5.  Following that review, the court ordered disclosure to cleared counsel of the FISA application materials.  SA5.  The court noted that the disclosure would be made "under an appropriate protective order."  SA5.

In its order, the court reviewed the relevant FISA procedures.  SA1-3.  It quoted the standard for disclosure of FISA materials after *in camera*, *ex parte* procedures are triggered by the Attorney General filing his affidavit.  SA3-4.  The district court recognized that it may disclose the FISA materials "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance."  SA3-4.

Noting that no court had ever allowed disclosure of FISA materials to the defense, the district court found that "in this case" such disclosure "may be necessary." SA5. This conclusion, the court observed, was "not made lightly, and follows a thorough and careful review of the FISA application and related materials." SA5. Based on its review of those materials, the court found that "an accurate determination of the legality of the surveillance is best made in this case as part of an adversarial proceeding." SA5.

The government's appeal followed.

## II. FACTUAL SUMMARY.

At this point in the case, there has been no determination of the facts. The government has detailed its allegations in its complaint. A6. Counsel have proffered the outlines of the defense in an *ex parte* proffer, which has now been unsealed (with the consent of the defense) and made part of the record. R.93. As the defense proffer demonstrates, there is a substantial question, to be litigated at trial, whether defendant was entrapped.

We anticipate the evidence will show that, beginning no later than May 2012, when defendant was eighteen, recently out of high school, and living with his parents, two FBI employees working online in an undercover capacity engaged him in discussion. One FBI employee portrayed himself as a Saudi national who was planning to fight in Syria or Yemen. The other claimed to be an Australian

with an interest in "violent jihad." The two undercover FBI employees introduced defendant to an undercover FBI agent posing as an operational terrorist.

Defendant met with the undercover agent six times between July 17, 2012 and September 14, 2012. During the meetings, the undercover agent repeatedly pressed defendant to come up with ideas for domestic terrorist operations, including identifying specific targets. The agent appealed to defendant's religious beliefs. He went so far as to agree to consult with a fictional sheikh for a "real fatwah" when defendant expressed concerns about a domestic attack, after leaders at his mosque told him that violent jihad was wrong. The recordings of these meetings reveal defendant as naive and gullible.

On September 14, 2012, while in the company of the undercover agent posing as a terrorist, defendant attempted to set off a fake car bomb outside a bar in Chicago. Minutes before the attempt, defendant questioned the agent about whether they could kill women. R.93 at 21. The agent responded, "Yes," and explained that they could do so if the women were paying taxes and supporting the government. R.93 at 21. Defendant asked, "But they never mentioned that women are halal [permissible] to kill. The only, the only brother mentioned that I'm like wait a minute, they also pay taxes and vote. You know. So that's a good . . . oh, so this is just like Palestine?" The undercover agent responded "Yes" and described

9

the United States as a "monster with two heads."  R.93 at 22.  Minutes later defendant attempted to detonate the fake bomb and was immediately arrested.

## SUMMARY OF ARGUMENT

1.     The government's argument rests on the premise that the word "necessary" in 50 U.S.C. § 1806(f) plainly means "essential" or "required."  That premise is wrong.  As the D.C. Circuit has observed, "The term 'necessary' is a chameleon-like word whose meaning . . . may be influenced by its context . . . .[It] is not language of plain meaning."  *Cellco Partnership v. FCC*, 357 F.3d 88, 96-97 (D.C. Cir. 2004)).  Courts have given the word a range of meanings, from "helpful" to "essential," depending on its context.

2.     The "context" of  § 1806(f), including its legislative history and the purposes of FISA, shows that Congress intended the term "necessary" to mean that disclosure would substantially promote the accuracy of the district court's determination of legality—not that disclosure had to be essential or indispensable to an accurate determination.  This intermediate interpretation—between "helpful" on one hand and "essential" on the other—is consistent with the authoritative Senate Reports that discuss the term and furthers the statutory goal of balancing civil liberties and national security.

3.     By contrast, the Senate Reports specifically rejected the government's interpretation of § 1806(f), under which the determination of legality is *always ex*

10

*parte* and disclosure is *never* permitted. In addition, that interpretation elevates national security over civil liberties in all cases and thus eviscerates the balance that Congress struck in the statute.

4. Under the correct interpretation of § 1806(f), the district court acted well within its broad discretion in choosing an adversarial process over *ex parte* proceedings. The government's remaining complaints—that the district court did not precisely track the statutory language in one portion of its order (after reciting that language a page earlier) and did not spell out the "case-specific" (and classified) details of its analysis—amount to the kind of hypertechnical hairsplitting that this Court routinely rejects.

## ARGUMENT

In the following Parts, we first address the appropriate standard of review. We then examine the structure and purpose of FISA. Finally, we demonstrate that the district court: (a) correctly interpreted 50 U.S.C. § 1806(f) and (b) appropriately exercised its discretion under that provision—and certainly did not abuse that discretion—in ordering disclosure of the FISA materials to cleared counsel under appropriate CIPA protective procedures.

## I.     THE STANDARD OF REVIEW.

This Court reviews the district court's disclosure order for abuse of discretion.  *See, e.g., United States v. El-Mezain*, 664 F.3d 467, 566 (5th Cir. 2011); *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005).

The abuse of discretion standard has two facets in this context.  First, the Court reviews *de novo* the district court's interpretation of the phrase "necessary to make an accurate determination of the legality of the surveillance" in 50 U.S.C. § 1806(f).  *See, e.g., Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1009 (7th Cir. 2013); *United States v. Young*, 41 F.3d 1184, 1186 (7th Cir. 1994).

Second, the Court will find that the district court abused its discretion in applying the "necessary" phrase to the circumstances of this case "only when no reasonable person could take the view of the trial court." *United States v. Dumeisi*, 424 F.3d 566, 574 (7th Cir. 2005); *see also, e.g., United States v. Harris*, 531 F.3d 507, 514 (7th Cir. 2008) ("We review a district court's denial of a motion for disclosure of the identity of a confidential informant for abuse of discretion and will affirm if any reasonable person could agree with the district court's decision."). As the Court has observed when reviewing other *in camera* determinations, it "rel[ies] particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as the government." *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (quotation omitted) (review of district court's

decision after *in camera* review under CIPA); *United States v. Plescia*, 48 F.3d 1452, 1457 (7th Cir. 1995) (affirming district court's refusal to disclose identity of confidential informant after *in camera* review and noting reliance on district court's discretion).

As we demonstrate below, the district court correctly interpreted § 1806(f), and its decision to order disclosure under the circumstances of this case, after "a thorough and careful review of the FISA application and related materials," SA5, was entirely reasonable.  It certainly cannot be said that "no reasonable person could take the view of the trial court."  *Dumeisi*, 424 F.3d at 574.

## II.    THE PURPOSE AND STRUCTURE OF FISA.

Congress enacted FISA in response to *United States v. United States District Court for the Eastern District of Michigan (Keith)*, 407 U.S. 297 (1972).[2]  In *Keith* the Supreme Court held that the Fourth Amendment does not permit warrantless surveillance in intelligence investigations of domestic security threats.  The Court noted the intrusiveness of electronic surveillance and cautioned that "[t]he historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech."  *Id*. at

---

[2] *See, e.g.,* S. Rep. 604(I), 95th Cong., 1st Sess. 13-14, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3914-16; S. Rep. 701, 95th Cong., 1st Sess. 9, 15-16, *reprinted in* 1978 U.S.C.C.A.N. 3973, 3977, 3984-85.

317. The Court invited Congress to legislate standards for intelligence-related surveillance that "differ from those already prescribed for specified crimes in Title III." *Id*. at 322.

FISA was also a response to the Report of the Senate Select Committee to Study Government Operations with Respect to Intelligence Activities (the Church Committee Report),[3] which found that the executive had engaged in warrantless wiretapping of numerous citizens—including journalists, political activists, and members of Congress—who posed no threat to the nation's security and who were not suspected of any criminal offense. The Church Committee Report warned presciently that "[u]nless new and tighter controls are established by legislation, domestic intelligence activities threaten to undermine our democratic society and fundamentally alter its nature."[4] Thus, FISA "was enacted to create a framework whereby the Executive could conduct electronic surveillance for foreign intelligence purposes without violating the rights of citizens."[5] The Act "was

---

[3] S. Rep. 755, 94th Cong. 2d Sess. (1976); *see* S. Rep. 604(I), 95th Cong., 1st Sess. 7 (Senate Judiciary Committee Report: "This legislation is in large measure a response to the revelations that warrantless electronic surveillance in the name of national security has been seriously abused," citing Church Committee report), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3908; S. Rep. 701, 95th Cong., 1st Sess. 9 (Senate Intelligence Committee Report with similar remark), *reprinted in* 1978 U.S.C.C.A.N. 3973, 3977.

[4] S. Rep. 755, 94th Cong. 2d Sess. (1976).

[5] *United States v. Hammoud*, 381 F.3d 316, 332 (4th Cir. 2004) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005), *reinstated in relevant part*, 405 F.3d 1034 (4th Cir. 2005) (en banc).

intended to strike a sound balance between the need for such surveillance and the protection of civil liberties."[6]

FISA seeks to accomplish this "sound balance" through several key provisions. First, FISA creates the FISC, to which the government must apply for an order authorizing electronic monitoring, 50 U.S.C. §§ 1803, 1804, or a physical search, *id*. § 1823.[7] As the United States Court of Appeals for the Fourth Circuit has observed, "[W]ith certain exceptions . . . a FISA judge must approve in advance all electronic surveillance of a foreign power or its agents."[8]

Second, the statute requires that the Attorney General approve any application to the FISC and that the application contain certain information and certifications.[9] The application to the FISC must include "a statement of the facts and circumstances relied upon by the applicant to justify his belief that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power."[10] FISA defines the term "foreign power" to include, among other entities, "a foreign government or any component thereof whether or not recognized by the

---

[6] *In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) (quotation omitted).

[7] The FISA provisions governing physical searches generally parallel the provisions governing electronic surveillance. Although our argument applies to both sets of provisions, for the sake of simplicity we refer solely to the electronic surveillance provisions.

[8] *Hammoud*, 381 F.3d at 332; *see, e.g., United States v. Sarkissian*, 841 F.2d 959, 964 (9th Cir. 1988); *United States v. Cavanagh*, 807 F.2d 787, 788 (9th Cir. 1987).

[9] 50 U.S.C. § 1804.

[10] *Id.* § 1804(a)(3)(A); *United States v. Posey*, 864 F.2d 1487, 1490 (9th Cir. 1989).

United States" and "a group engaged in international terrorism or activities in preparation therefor."[11]

An "agent of a foreign power," as applied to a "United States person" such as defendant,[12] means (among other things) "any person who . . . knowingly engages in . . . international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power"; and "any person who . . . knowingly aids or abets any person in the conduct of activities" described above.[13]

The government's application to the FISC must also provide a "statement of the proposed minimization procedures."[14]  FISA requires the government to adopt procedures that "are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information."[15]  The minimization

---

[11] 50 U.S.C. § 1801(a)(1), (4); *see, e.g., Hammoud*, 381 F.3d at 332 (Hizballah is a "foreign power" under FISA).

[12] *Id.* §§ 1801(i) (defining "United States person").

[13] *Id.* § 1801(b)(2)(C), (E).

[14] *Id.* § 1804(a)(4).

[15] *Id.* § 1801(h)(1).  The statute adds that, notwithstanding these provisions, minimization procedures may "allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes."  *Id.* § 1801(h)(3); *In re Sealed Case*, 310 F.3d 717, 731 (Foreign Intelligence Surveillance Court of Review 2002) (discussing FISA minimization procedures).

procedures must also "require that nonpublicly available information, which is not foreign intelligence information . . . shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance."[16]  Notwithstanding these requirements, courts have held that the FISA minimization provisions permit the government to record automatically all intercepted communications and to eliminate the non-foreign intelligence information later, when the surveillance tapes are logged and indexed.[17]  As a result of this around-the-clock surveillance, FISA wiretaps routinely intercept attorney-client, husband-wife, and other privileged communications.

The government's application to the FISC must contain certain "certifications" by an appropriate executive branch official.  Among other things, the official must certify that "a significant purpose of the surveillance is to obtain foreign intelligence information"[18] and that "such information cannot reasonably be obtained by normal investigative techniques."[19]

---

[16] 50 U.S.C. § 1801(h)(2).

[17]  *See, e.g., Hammoud*, 381 F.3d at 334; *In re Sealed Case*, 310 F.3d at 740-41; *In re Kevork*, 634 F. Supp. 1002, 1016-17 (C.D. Cal. 1985), *aff'd on other grounds*, 788 F.2d 566 (9th Cir. 1986).

[18]  The phrase "foreign intelligence information" is defined at 50 U.S.C. § 1801(e).  The phrase includes, among other things, (1) "information that . . . is necessary to . . . the ability of the United States to protect against . . . actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power [or] clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power," and (2) "information with respect to a foreign power . . . that . . . is necessary to . . . the national defense

Third, the statute specifies findings that the FISC must make before it can approve electronic surveillance.[20]  The court must find that the procedural requirements of FISA have been satisfied,[21] including the minimization requirements, and it must find (among other things) "probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power."[22]  When the target of the surveillance is a "United States person," the FISC must also determine that the government's certifications are not "clearly erroneous."[23]

Fourth, FISA requires notice to the target of the surveillance when the government "intends to enter into evidence or otherwise use or disclose" the fruits of FISA surveillance or a FISA search against an "aggrieved person" in any proceeding in a federal court.[24]  FISA defines "aggrieved person" as "a person who is the target of electronic surveillance or any other person whose communications

---

(continued…)

or national security of the United States [or] the conduct of the foreign affairs of the United States."  *Id.* § 1801(e)(1), (2).

[19] *Id.* § 1804(a)(6)(B), (C).

[20] *Id.* § 1805.

[21] *E.g., id.* §§ 1805(a)(1), (3), (4).

[22] *Id.* § 1805(a)(2)(A); *see, e.g., Dumeisi*, 424 F.3d at 579; *Hammoud*, 381 F.3d at 332-33 (discussing probable cause requirement).

[23] *Id.* § 1805(a)(4).

[24] *Id.* § 1806(c).

18

or activities were subject to electronic surveillance."[25]   Under these definitions, defendant is an "aggrieved person" for the electronic surveillance that targeted him. *See, e.g., United States v. Cavanagh*, 807 F.2d 787, 789 (9th Cir. 1987).   The statute authorizes any "aggrieved person" to move to suppress "evidence obtained or derived from" electronic surveillance if "the information was unlawfully acquired" or "the surveillance was not made in conformity with an order of authorization or approval."[26]

When an "aggrieved person" moves to suppress the fruits of FISA surveillance or a FISA search, the Attorney General may file an affidavit that "disclosure or an adversary hearing would harm the national security of the United States."[27]   Once the Attorney General files such an affidavit, as Attorney General Holder has done here, the court must review the FISA application, order, and related materials *ex parte* and *in camera*, unless "disclosure [to the defendant] is necessary to make an accurate determination of the legality of the surveillance."[28] Under 50 U.S.C. § 1806(f), any such disclosure must occur "under appropriate security procedures and protective orders."

We discuss the FISA procedures in more detail below.

---

[25] *Id.* § 1801(k).

[26] *Id.* § 1806(e).

[27] *Id.* § 1806(f).

[28] *Id.*; *see also id.* § 1806(g) (if court determines surveillance or search was "lawfully authorized," it shall deny motion to suppress "except to the extent due process requires discovery or disclosure").

## III. THE WORD "NECESSARY" IN 50 U.S.C. § 1806(f) MEANS THAT DISCLOSURE WOULD SUBSTANTIALLY PROMOTE AN ACCURATE DETERMINATION OF LEGALITY.

The government assumes without analysis that the word "necessary" in 50 U.S.C. § 1806(f) means—indeed, *plainly* means—"essential" or "required." G.Br.19.  Its entire argument flows from that premise.  But the premise is wrong.  As the D.C. Circuit has observed, "The term 'necessary' is a chameleon-like word whose meaning . . . may be influenced by its context . . . .[It] is not language of plain meaning."  *Cellco Partnership*, 357 F.3d at 96-97.  The "context" of §1806(f), including its legislative history and the purposes of FISA, demonstrates that Congress intended the term to mean that disclosure would substantially promote the accuracy of the district court's determination of legality—not that disclosure had to be essential or indispensable to an accurate determination.

### A. Courts Routinely Interpret "Necessary" To Mean Something Less Than Essential.

Contrary to the government's argument that "necessary" always and plainly means "essential," courts have frequently interpreted the word "to mean less than absolutely essential, and have explicitly found that a measure may be 'necessary' even though acceptable alternatives have not been exhausted."  *CT&IA v. FCC*, 330 F.3d 502, 510 (D.C. Cir. 2003) (quotation omitted).  Most famously, the Supreme Court confronted the term "necessary" in 1819, when it first interpreted the Necessary and Proper Clause.  That provision gives Congress the power

20

[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

U.S. Const. art. I, § 8. In defining the contours of the Clause, Chief Justice Marshall emphasized that "necessary" does not mean "absolutely necessary." *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 413-16 (1819); *see also, e.g., Jinks v. Richland County*, 538 U.S. 456, 462 (2003) ("[W]e long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be absolutely necessary to the exercise of an enumerated power.") (quotation omitted)). Similarly, in *Commissioner v. Tellier*, 383 U.S. 687 (1966), the Court found that the word "necessary" in the phrase "ordinary and necessary [business] expenses" imposes "only the minimal requirement that the expense be appropriate and helpful for the development of the taxpayer's business." *Id*. at 689 (quotations and brackets omitted).

Cases interpreting "necessary" emphasize that its meaning must be "harmonized with its context." *Armour & Co. v. Wantock*, 323 U.S. 126, 130 (1944). Relying on context, courts have often found "necessary" to mean something closer to "helpful" than to "essential" or "indispensable." *See, e.g., Snider v. United States*, 468 F.3d 500, 513 (8th Cir. 2006) (interpreting "necessary" in 26 U.S.C. § 6103; court rejects "strictly essential" and holds that the "'appropriate or helpful' meaning of 'necessary' is the only practical interpretation

in this context"); *Prometheus Radio Project v. FCC*, 373 F.3d 372, 393-94 (3d Cir. 2004) (interpreting "necessary" in § 202(h) of the Telecommunications Act of 1996 to mean "'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable'"); *FTC v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979) (interpreting "necessary" in 15 U.S.C. § 46; court holds that FTC's authority to conduct an ancillary investigation of a bank when "necessary" did not require investigation to be "absolutely needed" or "inescapable," but instead that it "arise reasonably and logically out of the main investigation").

These cases confirm that the central premise of the government's argument is simply wrong:  the word "necessary" does not plainly mean essential or indispensable.  Instead, the term must be read together with the phrase in which it is embedded—"necessary to make an accurate determination of the legality of the surveillance"—and in light of both the legislative history of FISA and the statutory purpose.  Read in this context, the term means that disclosure would substantially promote the accuracy of the district court's determination of legality—an intermediate interpretation between the extremes of "useful" on one side and "essential" on the other.[29]

---

[29] The government relies for its interpretation of "necessary" on a treatise.  G.Br.19 (citing 2 David S. Kris & J. Douglas Wilson, *National Security Investigations & Prosecutions* § 31:3, at 263 (2d ed. 2012)) ["Kris & Wilson"].  (The government mis-cites the relevant provision as § 29:3.)  But Kris and Wilson rely on the purported "plain meaning" of "necessary," without citing authority for that meaning, and they concede (in an understatement, as we demonstrate

**B.     The Legislative History of FISA.**

The legislative history of FISA cuts squarely against the government's insistence that the word "necessary" in § 1806(f) requires a showing that disclosure is essential or indispensable to an accurate determination of legality.

Two authoritative Senate Reports—one from the Senate Judiciary Committee and the other from the Senate Intelligence Committee—discuss in detail the provision that became § 1806.  The Reports observe:

> The extent to which the government should be required to surrender to the parties in a criminal trial the underlying documentation used to justify electronic surveillance raises delicate problems and competing interests.   On the one hand, broad rights of access to the documentation and subsequent intelligence information can threaten the secrecy necessary to effective intelligence practices.  However, the defendant's constitutional guarantee of a fair trial could seriously be undercut if he is denied the materials needed to present a proper defense.   The Committee believes that a just, effective balance has been struck in this section.

S. Rep. 604(I), 95th Cong., 1st Sess. 53, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3954; *see* S. Rep. 701, 95th Cong., 1st Sess. 59 (similar passage in Senate Intelligence Committee Report), *reprinted in* 1978 U.S.C.C.A.N. 3973, 4028. Turning to § 1806(f), the Committees summed up the disclosure provision as follows:

---

(continued…)

below) that what they consider the "plain meaning" of the term "is, however, somewhat at odds with the explanation in the legislative history."  *Id*.

The committee views the procedures set forth in this subsection as striking a reasonable balance between an entirely in camera proceeding which might adversely affect the defendant's ability to defend himself, and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information.

The decision whether it is necessary to order disclosure to a person is for the Court to make after reviewing the underlying documentation and determining its volume, scope and complexity. The committee has noted the reasoned discussion of these matters in the opinion of the Court in *United States v. Butenko*, [494 F.2d 593 (3d Cir. 1974) (en banc)]. There, the Court, faced with the difficult problem of determining what standard to follow in balancing national security interests with the right to a fair trial stated:

"The distinguished district court judge reviewed in camera the records of the wiretaps at issue here before holding the surveillances to be legal . . . Since the question confronting the district court as to the second set of interceptions was the legality of the taps, not the existence of tainted evidence, it was within his discretion to grant or deny Ivanov's request for disclosure and a hearing. The exercise of this discretion is to be guided by an evaluation of the complexity of the factors to be considered by the court and by the likelihood that adversary presentation would substantially promote a more accurate decision." (494 F.2d at 607.)

Thus, in some cases, the Court will likely be able to determine the legality of the surveillance without any disclosure to the defendant. In other cases, however, the question may be more complex because of, for example, indications of possible misrepresentation of fact, vague identification of the persons to be surveilled or surveillance records which includes [sic] a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order. In such cases, the committee contemplates that the court will likely decide to order disclosure to the defendant, in whole or in part since such disclosure "is necessary to make an accurate determination of the legality of the surveillance." [Footnote omitted.]

Cases may arise, of course, where the Court believes that disclosure is necessary to make an accurate determination of legality, but the Government argues that to do so, even given the Court's broad discretionary power to excise certain sensitive portions, would damage national security. In such situations the Government must choose—either disclose the material or forego the use of the surveillance-based evidence. Indeed, if the Government objects to the disclosure, thus preventing a proper adjudication of legality, the prosecution would probably have to be dismissed . . . .

S. Rep. 604(I), 95th Cong., 1st Sess. 58-59 (footnote omitted; ellipsis in original), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3959-60; *see* S. Rep. 701, 95th Cong., 1st Sess. 64-65 (identical language in Senate Intelligence Committee Report), *reprinted in* 1978 U.S.C.C.A.N. 3973, 4033-44.

Several points are evident from this passage. First, the Senate Judiciary and Intelligence Committees plainly did not anticipate what followed over the next thirty-six years—that no court would *ever* find the "necessary" standard satisfied. Nothing in the Committees' discussion suggests that they intended that standard to erect an insuperable barrier to disclosure. To the contrary, in choosing a balanced approach, the Committees specifically eschewed "an entirely *in camera* proceeding"—only to have the courts overturn that Congressional intent through an overly strict interpretation of "necessary."

Second, the Committees, through their citation to *Butenko*, placed broad discretion in district judges in determining when disclosure is "necessary to make an accurate determination of the legality of the surveillance." They intended that

discretion to be exercised "after reviewing the underlying documentation and determining its volume, scope and complexity"—precisely as the district court did here.

Third, the Committees—again through their reliance on *Butenko*—suggest that the "necessary" standard is met when the district court determines that "adversary presentation would substantially promote a more accurate decision"—a far lower standard than the "essential" or "indispensable" standard the government advocates.

Fourth, the Committees noted the district court's "broad discretionary power to excise certain sensitive portions" from the FISA materials before disclosure. This recognition of the district court's inherent power to take necessary protective measures now finds a statutory basis in CIPA (discussed below).  That power substantially ameliorates the government's professed national security concerns.

Finally, the Senate Judiciary and Intelligence Committees contemplated—and did not shy away from—the outcome the government suggests is intolerable (G.Br.29-30):  that the district court would order disclosure, the government would refuse to comply, and the court would suppress the surveillance or dismiss the prosecution.  Just as Congress did in CIPA, 18 U.S.C. App. 3 § 6(e), the Committees left the choice with the government:  either comply with the disclosure order or refuse and suffer appropriate sanctions.

Two other portions of the legislative history are relevant as well. First, an early version of the definition of "foreign intelligence information" included the words "necessary" and "essential." "Necessary," according to the Senate Judiciary Committee, "requires more than a showing that the information would be useful or convenient." S. Rep. 604(I), 95th Cong., 1st Sess. 31, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3933. "Essential" requires "a showing that the information is important and required but not that it is of utmost importance or indispensable." *Id*. Thus, "necessary" merely meant something more than "useful or convenient," and not even "essential" required a showing that information was "indispensable."

The Senate Intelligence Committee deleted "essential" from the final definition of "foreign intelligence information" (codified at 50 U.S.C. § 1801(e)). The Intelligence Committee declared that by the term "necessary," it "intends to require more than a showing that the information would be useful or convenient. The committee intends to require that the information is both important and required. The use of this standard is intended to mandate that a *significant need* be demonstrated by those seeking the surveillance." S. Rep. 701, 95th Cong., 1st Sess. 31 (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 3973, 4000. As Kris & Wilson observe, in practice the word "necessary" in § 1801(e) means little more than "relevant." 1 Kris & Wilson, *supra*, § 8:30 at 299-300.

27

Second, the minimization procedures in 50 U.S.C. § 1801(h)(2) bar dissemination of nonpublicly available information in a manner that identifies any United States person without the person's consent, "unless such person's identity is necessary to understand foreign intelligence information or assess its importance." The House Conference Report explains that "[b]y 'necessary' the conferees do not mean that the identity must be essential to understand the information or assess its importance. The word necessary requires that a knowledgeable intelligence analyst make a determination that the identity will contribute in a meaningful way to the ability of the recipient of the information to understand the information or assess its importance." H. Conf. Rep. 1720, 95th Cong., 2d Sess. 23 (Oct. 5, 1978).

The use of "necessary" in §§ 1801(e) and 1801(h)(2) sheds light on the word's meaning in § 1806(f). As the Supreme Court has observed, "[I]dentical words and phrases within the same statute should normally be given the same meaning." *Hall v. United States*, 132 S. Ct. 1882, 1891 (2012) (quotation omitted); *see, e.g., United States v. Robers*, 698 F.3d 937, 942 (7th Cir. 2012). Under this principle, the meanings ascribed to "necessary" in §§ 1801(e), 1801(h)(2), and 1806(f) should be the same. And, according to the legislative history, the meanings are very similar: "significant need" in § 1801(e), "contribute in a meaningful way" in § 1801(h)(2), and "substantially promote" in § 1806(f). These

standards are all somewhat higher than "useful or convenient," but far lower than the "essential" or "indispensable" standard that the government advocates.

## C.     The Legislative Purpose.

A court must construe a statutory term "in a manner consistent with the [statute's] purpose."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001); *see, e.g., Ryan v. United States*, 725 F.3d 623, 626 (7th Cir. 2013) (where statute is ambiguous, court must "interpret it in the manner most consistent with the statutory language as a whole, its purpose, and in a manner that will render it constitutional").   As noted above, FISA "was enacted to create a framework whereby the Executive could conduct electronic surveillance for foreign intelligence purposes without violating the rights of citizens."  *Hammoud*, 381 F.3d at 332.  The Act "was intended to strike a sound balance between the need for such surveillance and the protection of civil liberties."[30]  Interpreting "necessary" in § 1806(f) to have the intermediate meaning of "substantially promote" is fully

---

[30] *In re Kevork*, 788 F.2d at 569 (quotation omitted); *see, e.g.,* S. Rep. 604(I), 95th Cong., 1st Sess. 4 (Senate Judiciary Committee Report notes Attorney General Griffin Bell's view that "this bill strikes the balance, sacrifices neither our security nor our civil liberties, and assures that the abuses of the past will remain in the past . . . ."), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3905-06; *id*. at 7 (bill "goes a long way in striking a fair and just balance between protection of national security and protection of personal liberties"), *reprinted in* 1978 U.S.C.C.A.N. at 3908; *id*. at 9 ("Striking a sound balance between the need for such surveillance and the protection of civil liberties lies at the heart of S. 1566."), *reprinted in* 1978 U.S.C.C.A.N. at 3910; S. Rep. 701, 95th Cong., 1st Sess. 7, 16 (Senate Intelligence Committee Report with similar remarks), *reprinted in* 1978 U.S.C.C.A.N. 3973, 3975, 3985.

consistent with FISA's effort to balance civil liberties and the need for surveillance—a balance in need of recalibration, as recent events confirm.

### 1.    Protecting Civil Liberties.

The government's interpretation of § 1806(f)—that "necessary" means "essential," and disclosure is *never* "essential"—does nothing to advance civil liberties. To the contrary, a system that operates in secret, with no adversarial input—as the FISA process has functioned for more than thirty-five years—is almost certain to breed abuse.

The Supreme Court has declared that "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" *United States v. James Daniel Good Real Property*, 510 U.S. 43, 55 (1993) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)). The Court made the same point in *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that a defendant must be permitted to attack the veracity of the affidavit underlying a search warrant, upon a preliminary showing of an intentional or reckless material falsehood. The Court rested its decision in significant part on the *ex parte* nature of the procedure for issuing a search warrant and the value of adversarial proceedings:

[T]he hearing before the magistrate [when the warrant is issued] not always will suffice to discourage lawless or reckless misconduct. The pre-search proceeding is necessarily ex parte, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence. The usual reliance of our legal system on adversary proceedings itself should be an indication that an ex parte inquiry is likely to be less vigorous. The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an independent examination of the affiant or other witnesses.

438 U.S. at 169.

The same considerations that the Court found compelling in *Franks* and *James Daniel Good* militate against uniformly *ex parte* procedures in the FISA context. As early as 2002, the FISC acknowledged (in an extremely rare published opinion) that without adversarial proceedings, systematic executive branch misconduct—including submission of dozens of FISA applications with "erroneous statements" and "omissions of material facts"—went undetected by the courts until the DOJ chose to reveal it. *See In re All Matters*, 218 F. Supp. 2d 611, 620-21 (Foreign Intelligence Surveillance Court), *rev'd,* 310 F.3d 717 (Foreign Intelligence Surveillance Court of Review 2002).[31]

---

[31] The FISC was sufficiently alarmed by these erroneous applications that it "decided not to accept inaccurate affidavits from FBI agents whether or not intentionally false," and "[o]ne FBI agent was barred from appearing before the Court as a FISA affiant." *In re All Matters*, 218 F. Supp. 2d at 621.

Recent revelations provide further evidence that the *ex parte* FISA system has failed to meet the statutory goal of protecting civil liberties. For example, in a FISC opinion dated March 2, 2009, in the matter captioned *In re Production of Tangible Things From [REDACTED]*, Dkt. BR 08-13, Judge Reggie B. Walton of the United States District Court for the District of Columbia documented a number of statutory violations of the NSA's electronic surveillance programs. Judge Walton rejected the government's explanations for the violations and criticized its repeated misrepresentations and non-compliance with FISC orders. *See* R.74 at 5-6.

Similarly, in a declassified FISC opinion dated October 3, 2011, Judge John D. Bates of the United States District Court for the District of Columbia found the NSA's surveillance under the FAA to be "deficient on statutory and constitutional grounds," particularly with respect to the mass collection of emails of American citizens that were entirely domestic and not to or from a foreign intelligence target. Judge Bates also found that the NSA had been acquiring Internet transactions before the FISC approved of such acquisitions. *See* R.74 at 6-7.

Judge Bates found serious problems with the NSA's collection of information in another extensive FISC Opinion, which the DNI released to the public on November 18, 2013. As stated at the outset of this 117-page opinion, Judge Bates reviewed the government's "application to re-initiate in expanded form

32

a pen register/trap and trace (PRITT) authorization for the National Security Agency (NSA) to engage in bulk acquisition of metadata about Internet communications." (p. 1).[32] In reviewing the government's application, Judge Bates cited a number of "serious compliance problems" with the NSA's collection of Internet metadata and its years-long disregard of the limits imposed on it by the FISC. Remarkably, despite the severity of these criticisms of the NSA's failure to comply with the FISC's orders, as well as the NSA's repeated misrepresentations before the FISC, the NSA surveillance programs at issue were ultimately allowed to continue with modifications and reporting requirements. *See* R.74 at 7-9.

Three stark statistics underscore the dysfunction of the current FISA system: (1) year in and year out, the FISC approves without modification the overwhelming majority of the FISA applications the government presents and rejects only a tiny handful—if that—out of more than a thousand;[33] (2) until the district court's order in this case, no court had ever granted defense counsel access to FISA applications and orders under § 1806(f), so no adversarial eye had ever

---

[32] The government also sought "Court authorization to query and use information previously obtained by NSA, regardless of whether the information was authorized to be acquired under prior bulk PR/TT orders of the [FISC] or exceeded the scope of previously authorized acquisition." (pp. 1-2).

[33] According to the Attorney General's annual reports (available at http://fas.org/irp/agency/doj/fisa), since 1978 the FISC has approved (either as submitted or with modifications) well over 20,000 applications or extensions authorizing FISA surveillance, more than 99% of the total applications submitted. The FISC has rejected outright only a handful of applications, and the DOJ has successfully resubmitted some of those. The statistics for 2013, released a few days ago, are typical: the government made 1,588 applications for electronic surveillance; none were denied or withdrawn; and the FISC modified 34 applications.

scrutinized them; and (3) no court has ever granted a motion to suppress the fruits of FISA surveillance.

Until recently, some might have argued that these three statistics were unrelated, or that they showed that the government officials who prepared FISA applications had performed near-perfectly for 35 years. But recent developments—including the declassified opinions by Judges Bates and Walton— have destroyed any such illusions. The stark fact is that the FISA system, interpreted by the courts to require ex parte proceedings in *every* case and *never* to grant defense counsel access to FISA applications and orders, has failed to protect civil liberties. Interpreting § 1806(f) as Congress intended, to permit disclosure when adversarial proceedings will substantially promote the accuracy of the district court's determination, marks an important step toward restoring the balance that Congress sought to strike in 1978.[34]

---

[34] Professor Michael J. Glennon of the Fletcher School of Law and Diplomacy at Tufts University has written a recent article titled *National Security and Double Government*, 5 Harv. National Security J. 1 (2014), which, it is suggested, explains why this balance has become so lopsided. Glennon argues, in short, that the President now exercises little substantive control over the overall direction of U.S. national security policy, and that neither Congress nor the courts have the ability to exercise any meaningful oversight, and instead provide only the illusion of accountability. *Id.* at 110. Drawing upon the theory of the 19th Century British scholar Walter Bagehot, Glennon suggests instead this control is exercised by what has effectively become a "double government" network made up of the forty-six federal departments and agencies of millions of employees and a total annual outlay of around $1 trillion, who are engaged in classified national security work whose missions range from intelligence gathering and analysis to what Glennon describes as "war-fighting, cyber-operations and weapons development." Glennon also points out that some 1,271 government organizations and 1,931 private companies work on various programs related to counterterrorism, homeland security, and intelligence in about 10,000 locations in the United States. With operations of such mammoth proportions it is little wonder, Glennon posits, that these bureaucracies have an incentive to

### 2.    Protecting National Security.

The government's principal argument for reading "necessary" to mean "essential" or "indispensable" (apart from its misguided plain meaning argument) is that *any* disclosure of FISA materials, *ever*, to *any* defense counsel, under *any* circumstances, will cause irreparable damage to national security.   The Senate Judiciary and Intelligence Committees did not accept that view in 1978, as their Reports confirm.   The argument is even more clearly wrong now, following the enactment of the Classified Information Procedures Act ("CIPA") in 1980 (two years after the enactment of FISA) and the extensive experience that courts, prosecutors, and defense counsel have had with the statute since then.

CIPA contains several provisions that speak to the government's overblown concern that disclosure would endanger national security here.   First, it provides for entry of a protective order.[35]   The CIPA protective order—the standard terms of which are largely settled after decades of experience—sets the conditions under which defense counsel may review classified discovery, establishes procedures for filing classified pleadings, and prohibits anyone associated with the defense from revealing publicly the classified information to which access is granted.   *See, e.g.,*

---

(continued…)

"exaggerate risks and pander to public fears—an incentive to pass along vague and unconfirmed threats of future violence, in order to protect themselves from criticism should another attack occur."   *Id*. at 27-28 (footnotes and quotations omitted).

[35] 18 U.S.C. App. 3 § 3.

*United States v. Gowadia*, 2010 U.S. Dist. LEXIS 80572 (D. Haw. May 8, 2010) (entering a typical CIPA protective order).

The protective order also appoints Court Security Officers in accordance with the security procedures adopted by the Chief Justice under CIPA § 9(a).[36] Although the CSOs work for the Department of Justice, they are independent of the prosecution team. They advise the parties and the court on the proper handling of classified information, and they serve as conduits for the flow of classified discovery and pleadings among the parties and the court.[37]

The CIPA protective order requires defense counsel and other members of the defense team to obtain security clearances before receiving access to classified discovery. The protective order also requires the defense to maintain all classified information in a Sensitive Compartmented Information Facility, or SCIF. The SCIF consists of one or more secure rooms, usually in the federal courthouse where the case is being heard. It is protected by locks and other security devices. The SCIF contains safes to hold classified documents, secure computers on which to prepare classified pleadings, and other approved equipment.

Once the protective order is in place, defense counsel has the necessary clearance, and the SCIF is ready, the parties begin the classified discovery process.

---

[36] 18 U.S.C. App. 3 § 9(a). The procedures, issued by Chief Justice Warren Burger in 1981, appear in a note following CIPA § 9.

[37] *See* 9 United States Attorney's Manual, Criminal Resource Manual § 2054(I)(C) (describing role of CSO).

CIPA § 4 governs classified discovery. That provision allows the court to authorize the government, "upon a sufficient showing," to delete classified information from the discovery it provides or to furnish substitutions for the classified information in the form of summaries or admissions. The statute adds that "[t]he court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone." 18 U.S.C. App. 3 § 4.[38] The government has already invoked the CIPA § 4 procedures in this case. R.39, 45, 48.

CIPA has been in existence 34 years. During that time huge volumes of enormously sensitive classified information have been made available under its strict security measures to cleared defense counsel in scores of federal criminal cases—without, as far as counsel are aware, a serious security violation by the defense. In a case handled by one of undersigned counsel, the CIPA procedures successfully protected nuclear weapon codes that government scientists testified under oath were capable of "changing the strategic global balance" and thus "represent[ed] the gravest possible security risk to the United States." *United States v. Lee*, 2000 U.S. App. LEXIS 3082, at *5-*6 (10th Cir. Feb. 29, 2000). If the CIPA procedures could adequately protect those secrets (and other sensitive

---

[38] CIPA contains additional procedures governing the use of classified information at trial and in hearings and giving the government a right of interlocutory appeal. *See* 18 U.S.C. App. 3 §§ 5, 6, 7, 8.

classified information in many other cases), they can surely protect the secrets contained in the FISA materials that the district court has ordered disclosed.

Apart from an unfounded and insulting suggestion that cleared defense counsel cannot be trusted with classified information, G.Br.28-29 n.15, the government rests its "national security" argument (or at least the portion that defense counsel are permitted to see) on the contention that, despite having the requisite security clearances, defense counsel lack a "need to know" the classified information contained in the FISA materials.   G.Br.27-29.   The government's argument is circular.  If this Court affirms the district court's disclosure order, then counsel will have a need to know the FISA information to adequately defend their client—just as every cleared defense counsel in a case involving classified information has the requisite need to know discoverable classified information.

We offer a final word on the government's professed security concerns.  In case after case over the years, the government has made national security claims that have proven exaggerated.  To cite a few famous examples, the government argued in 1971 that disclosure of the Pentagon Papers would cause grave damage to national security.  *See New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam).  The New York Times published the Papers, and there is no evidence that national security suffered.  In 1979, the government sought to suppress Howard Morland's article, The H-Bomb Secret, claiming that publication

would cause immediate and irreparable harm to national security. *See United States v. Progressive, Inc.*, 486 F. Supp. 5 (D. Wis.), *dismissed as moot*, 610 F.2d 819 (7th Cir. 1979). The Progressive published Morland's article in November 1979, and—again—there is no evidence of any harm to national security. In December 1999, the government made strident national security claims to convince a federal court to detain Dr. Wen Ho Lee under extraordinarily strict conditions for nine months. *See United States v. Lee*, 79 F. Supp. 2d 1280 (D.N.M. 1999), *aff'd mem.*, 2000 U.S. App. LEXIS 3082 (10th Cir. Feb. 29, 2000). In September 2000, following a plea bargain, Dr. Lee regained his freedom. There is no evidence that his release has caused any damage to the national security.

These examples share several common features: in each case, the government invoked national security to convince a court to depart from statutory or constitutional standards; in each case, courts initially acceded to the government's national security claims; and in each case, when the "doomsday" event actually occurred, the government's purported concerns proved unfounded. As the Fourth Circuit has observed in the First Amendment context:

> History teaches how easily the spectre of a threat to "national security" may be used to justify a wide variety of repressive government actions. A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to possible abuse.

*In re Washington Post Co.*, 807 F.2d 383, 391-92 (4th Cir. 1986).

Here, as in *Washington Post*, the government's claim of doom if § 1806(f) is interpreted in accordance with Congressional intent must be viewed skeptically. National security will no more suffer if the FISA materials are disclosed to cleared defense counsel, with all the strict and time-tested protections CIPA affords, than it will in the everyday disclosures to cleared prosecutors.[39]   And if the government ultimately finds that risk unacceptable, then, as the Senate Judiciary and Intelligence Committees observed, it "must choose—either disclose the material or forego the use of the surveillance-based evidence."  S. Rep. 604(I), 95th Cong., 1st Sess. 59, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3960; *see* S. Rep. 701, 95th Cong., 1st Sess. 65, *reprinted in* 1978 U.S.C.C.A.N. 3973, 4044.  The Republic, or what is left of it, will survive.

---

[39] What can readily be seen is the effort of the intelligence agencies to resist any effort to control their province.  This agency concern is not limited to defense lawyers.  A telling description of the issue is set forth in former CIA lawyer John Rizzo's recent book, *Company Man: Thirty Years of Controversy and Crisis in The CIA* (Scribner 2014).  In discussing the use of classified evidence in espionage cases, and the tension created between the agency and the DOJ prosecutors, Rizzo candidly acknowledges:  "We tell the DOJ that we will turn cartwheels to provide our intelligence secrets necessary to get a conviction, but we are going to push back hard if we think the DOJ is going for overkill by putting sensitive information into jeopardy when it doesn't have to."  *Id.* at 67.  Indeed, it is of no small consequence that the Department of Justice Counterterrorism Section was taken out of the Criminal Division chain of command and merged into a newly created National Security Division in 2006.  This move was a fundamental shift in priorities and organizational oversight.  Indeed, three new sections were created "to handle the increased Foreign Intelligence Surveillance Act (FISA) workload, better coordinate FISA litigation and improve national security oversight."  *See Structural Changes to Enhance Counter-Terrorism Efforts, http://www.justice.gov/911/counterterrorism.html*  Needless to say, permitting intelligence agencies to dictate the responsibilities of prosecutors, defense lawyers, or this Court in a federal criminal case is a slippery slope of gargantuan proportions.

**D.    Summary.**

The "chameleon-like" word "necessary" has no "plain" meaning, and certainly not the meaning the government seeks to assign to it.  Courts have interpreted the word to mean everything from "helpful" to "essential," depending on the context.  The context here—particularly the legislative history of FISA and the statutory purpose to balance national security and civil liberties—points toward an intermediate meaning, such as the "substantially promote" formulation in *Butenko*, which the Senate Judiciary and Intelligence Committees endorsed.

As *Butenko* suggests, application of that intermediate standard requires that the district court enjoy broad discretion to consider all relevant circumstances.  The district court exercised that discretion here.  After a "thorough and careful review of the FISA application and related materials," the court determined that although it is "capable" of determining the legality of the surveillance ex parte, the determination is "best made" in an adversarial proceeding.  SA5.  The court concluded, in other words, that adversarial proceedings will substantially promote an accurate determination of legality.  Just as it was within the discretion of the district court in *Butenko* "to grant or deny Ivanov's request for disclosure and a hearing," so was it in the discretion of the district court here to make that decision.

## IV.   THE GOVERNMENT'S REMAINING COMPLAINTS ABOUT THE DISTRICT COURT'S ORDER ARE BASELESS.

The government offers two further complaints about the district court's order.  Neither has merit, and neither shows that the court's ruling was irrational and thus an abuse of discretion.  We address the government's points briefly.

### A.   The District Court Recited the Correct Legal Standard.

First, focusing on the district court's use of the phrase "may be necessary" in one part of its opinion, the government insists that the court applied the wrong legal standard.  *E.g.*, G.Br.12, 32.  In large measure, the government's complaint rests on its unduly strict interpretation of "necessary."  The district court's analysis, viewed as a whole, merely recognizes that, under the circumstances of this case, an adversarial presentation will substantially promote the accuracy of the court's determinations about the legality of the FISA surveillance.

The government is wrong for a second reason.  This Court has often held, in response to similarly hypertechnical arguments of criminal defendants, that district judges are not required to "recite 'magic words'" to demonstrate their adherence to a statutory standard.  *United States v. Woods*, 556 F.3d 616, 623 (7th Cir. 2009) (referring to 18 U.S.C. § 3553(a)); *see, e.g., United States v. Tyra*, 454 F.3d 686, 687 (7th Cir. 2006) (same).  That principle applies equally here.  The district court recognized and recited the correct "is necessary" standard under 50 U.S.C. § 1806(f).  SA3-4.  It is unlikely that the court forgot or chose to ignore that

standard a page-and-a-half later in its opinion.[40]  The issue here is not whether the

court applied the proper rule—it clearly did—but whether it applied that rule in an

"arbitrary" or "irrational" way.  In this Court's words, the question is whether it can

fairly be said that "no reasonable person could take the view of the trial court."

*Dumeisi*, 424 F.3d at 574.  The district court's thoughtful and considered ruling

must be affirmed under that standard.

### B.    The District Court Had No Obligation To Detail Its Analysis in Its Order.

Second, the government insists that the district court had to specify a "case-

specific reason" for disclosure in its order.  G.Br.20, 21, 22.  Not surprisingly, it

cites no authority for this proposition.  In fact, it is customary for courts addressing

FISA and other classified information issues *not* to spell out the decision making

process on the record.  *See, e.g., United States v. Abu-Jihaad*, 630 F.3d 102, 130

(2d Cir. 2010) (court is "necessarily circumspect" in its discussion of FISA

materials); *United States v. Squillacote*, 221 F.3d 542, 554 (4th Cir. 2000) ("Given

the sensitive nature of the information upon which we have relied in making this

determination and the Attorney General's conclusion that disclosure of the

---

[40] To illustrate the shallowness of the government's "legal error" argument, consider Attorney General Holder's declaration and claim of privilege in this case.  At page 2, the declaration avers that disclosure of the FISA materials "would harm the national security of the United States."  A2.  That is the correct legal standard under 50 U.S.C. § 1806(f).  On the next page, however, the Attorney General asserts that such disclosure "could" harm the national security.  A3.  The use of "could," after recitation of the correct "would" standard, no more vitiates the declaration than the district court's use of "may be necessary," after recitation of the correct "is necessary" standard, vitiates the disclosure order.

underlying information would harm the national security, it would be improper to elaborate further."); *United States v. Isa*, 923 F.2d 1300, 1304 (8th Cir. 1991) (finding probable cause to authorize FISA surveillance; court notes that "[b]ecause of the Affidavit and Claim of Privilege filed by the Attorney General of the United States, we make no further public statement").  By alluding to its "thorough and careful review" but making no further comment, the district court provided assurances that it had fully considered the "case-specific" circumstances, but without spreading those circumstances on the record and thus damaging national security.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order.

## STATEMENT CONCERNING ORAL ARGUMENT

Appellee requests oral argument.  The Court has scheduled argument for June 4, 2014.

DATED:  May 16, 2014

                                               Respectfully submitted,

                                               /s/  Thomas Anthony Durkin
                                               Thomas Anthony Durkin

                                               /s/  John D. Cline
                                               John D. Cline

                                               /s/  Joshua G. Herman
                                               Joshua G. Herman
                                             Attorneys for Defendant-Appellee
                                             ADEL DAOUD

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(A)(7)(C)

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) the foregoing brief is

proportionately spaced, has a typeface of 14 points, and contains 10,884 words.


   /s/ Thomas Anthony Durkin
Thomas Anthony Durkin

**CERTIFICATE OF SERVICE**
**When All Case Participants Are Registered For**
**The Appellate CM/ECF System**

I hereby certify that on the 16th of May, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/  Thomas Anthony Durkin
Thomas Anthony Durkin